# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| PRESIDENTIAL BANK, FSB, | : | | |
| | : | | |
| Plaintiff & Counter-Defendant, | : | Civil Action No.: | 16-2412 (RC) |
| | : | | |
| v. | : | Re Document No.: | 66 |
| | : | | |
| 1733 27TH STREET SE LLC, *et al.*, | : | | |
| | : | | |
| Defendants & Counter-Claimants. | : | | |

## MEMORANDUM OPINION

### GRANTING PLAINTIFF & COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. INTRODUCTION

Plaintiff Presidential Bank, FSB and Defendants Kevin Green and six LLCs he owns ("Defendants") have been involved in a lending dispute now spanning over a decade. Between 2006 and 2010, Presidential Bank made several loans to Defendants secured by D.C. real property owned by Defendants. After Defendants repeatedly defaulted on those loans, the parties entered into, *inter alia*, a loan modification agreement in 2014 and then a forbearance agreement in 2015. The forbearance agreement contained several financial conditions in exchange for Presidential Bank forbearing on collection of the debt, including a lockbox provision requiring that rental revenue from the collateral properties be deposited in an account under Presidential Bank's control, to be disbursed by the bank according to a specific order of priorities. The agreement also contained a confession of judgment clause.

After Defendants defaulted on the forbearance agreement, Presidential Bank accelerated the debt and sued Defendants in Maryland state court, relying on the confession of judgment clause. Presidential Bank also sued Defendants for conversion in D.C. Superior Court, alleging that they had failed to comply with the lockbox agreement and had retained rental proceeds for

themselves. Defendants aggressively contested the D.C. Superior Court suit, first removing it to this Court and then raising no less than twelve affirmative defenses and bringing nine counterclaims. The Court dismissed all but three of the counterclaims, and, after Presidential Bank fully and finally prevailed in the Maryland state court case, granted Presidential Bank summary judgment on all but one of Defendants' affirmative defenses.

Presidential Bank now moves for summary judgment on Defendants' three remaining counterclaims, for retaliation in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, breach of contract, and tortious interference with contract. Presidential Bank argues that two of the claims are barred by res judicata and that all three claims separately fail as a matter of law. While appearing to concede much of Presidential Bank's arguments, Defendants oppose the motion, contending that it is unclear whether they were truly in default when the bank sued to enforce the forbearance agreement. The Court finds that argument meritless and is satisfied that Presidential Bank has shown its entitlement to summary judgment. The Court therefore grants the motion for summary judgment in its entirety.

## II. BACKGROUND

The Court has already set out the underlying facts of this case in detail in its prior opinions. *See Presidential Bank, FSB v. 1733 27th Street SE LLC* ("*Presidential Bank II*"), 318 F. Supp. 3d 61, 67–69 (D.D.C. 2018); *Presidential Bank, FSB v. 1733 27th Street SE LLC* ("*Presidential Bank I*"), 271 F. Supp. 3d 163, 165–66 (D.D.C. 2017). It assumes familiarity with those prior opinions and only summarizes the facts most relevant to the present motion.

### A. The Initial Loans and 2015 Forbearance Agreement

Between 2006 and 2010, Presidential Bank entered into seven loan agreements with the six LLCs controlled by Green named as defendants in this case. *See Presidential Bank II*, 318 F.

Supp. 3d at 67; Compl. ¶ 5, ECF No. 1-1; Countercl. ¶¶ 15–22, ECF No. 12. Each agreement was secured by a deed of trust, with real estate property controlled by the LLCs serving as collateral on each of the loans. *See Presidential Bank II*, 318 F. Supp. 3d at 67; Compl. ¶ 5; Countercl. ¶¶ 15–22. Defendants defaulted on the loans in 2014 and the parties engaged in a "global loan modification agreement" on October 17, 2014. *See* Compl. ¶¶ 6–9; Countercl. ¶¶ 28–29. One condition of the loan modification agreement was that Defendants deposit all rental income from the collateral properties in separate accounts at Presidential Bank, to serve as additional collateral for the loans. *See* Compl. ¶ 9; Countercl. ¶ 29. Defendants were allowed to withdraw from those accounts only "those usual and customary funds necessary to carry out [their] day-to-day business operations." Global Loan Modification Agreement 5, Pl.'s Mem. Supp. Mot. Summ. J. Ex. 2, ECF No. 66-2. The agreement required Defendants to bring all loans current by January 15, 2015. *Id.*

But Defendants defaulted on the loan modification agreement as well. *See* Green Dep. 78:13–79:5, Mar. 30, 2018, Defs.' Opp'n Mot. Summ. J. Ex. 2, ECF No. 66-1. Rather than foreclosing on the properties, Presidential Bank agreed to enter into a forbearance agreement with Defendants. *See id.* 79:6–14; Forbearance Agreement 1, Pl.'s Mem. Supp. Ex. 3, ECF No. 66-3. The forbearance agreement included a number of conditions in exchange for Presidential Bank delaying collecting on the debt until April 1, 2017. *See* Forbearance Agreement 5–10. Amongst others, the forbearance agreement included an "Account and Lockbox Agreement" (the "lockbox agreement"), which provided not only that Defendants would continue to deposit rental income in separate accounts controlled by Presidential Bank, but also that Defendants would not be able to withdraw such funds from the accounts for any reason. *See id.* at 5–6. Instead, the bank itself would disburse money from the accounts according to an order of priority agreed to

by the parties, with the important caveat that the bank was entitled to use the entire balance of each account to pay for the loans or to protect its interests in the collateral properties if Defendants defaulted under the forbearance agreement. *See id.* at 6. The forbearance agreement also included a confession of judgment clause, which provided for Defendants' confession of judgment in the event of default as to "the amount of the unpaid principal balance . . . together with any accrued and unpaid interest, late charges and attorneys' fees and costs incurred by the lender, together with all other costs and expenses incurred or accrued and unpaid under th[e] agreement." *Id.* at 9. Finally, the forbearance agreement required that Defendants bring each loan current by December 31, 2015. *Id.* at 7.

**B. Defendants' Default Under the Forbearance Agreement and the Maryland Litigation**

Defendants never brought the loans current. *See* Green Dep. 89:9–90:1. By May 2016, the loans were approaching 90 days behind payment. *See id.* 98:19–99:1. On May 1, 2016, Green filed a complaint about Presidential Bank with the Department of the Treasury's Office of the Comptroller of the Currency ("OCC"). *See id.* 116:5–7. OCC sent a letter to Green acknowledging the complaint on May 11, 2016, *see id.* 116:18–117:6, and the Bank first became aware of the complaint at some point later in the month, *see* Giraldi Aff. ¶ 2, Pl.'s Mem. Supp. Ex. 6, ECF No. 66-6; Green Dep. 117:14–16. At the end of the month, Green began contacting tenants of the collateral properties to ask them to no longer pay rent in the accounts identified in the lockbox agreement, and instead to begin making rental payments in accounts he controlled. *See* Green Dep. 34:6–35:9; 100:6–16.

The same month, Presidential Bank began preparing to foreclose on the collateral properties. The bank engaged the services of a law firm on May 4, 2016 "in connection with the bank's rights and remedies related to Kevin Green and his affiliated entities." Miles &

Stockbridge P.C. Engagement Letter, Pl.'s Mem. Supp. Ex. 7, ECF No. 66-7; *see also* Giraldi Aff. ¶ 3. On June 16, 2016, the bank filed a complaint for entry of judgment by confession in the Circuit Court of Montgomery County, Maryland. *See Green v. Presidential Bank, FSB*, No. 2092, Sept. Term, 2016, 2018 WL 904445, at *1–2 (Md. Ct. Spec. App. Feb. 14, 2019) (unreported). The circuit court entered confessed judgment in Presidential Bank's favor, in the amount of $3,314,295.63, on June 27, 2016. *See id.* at *2. On September 19, 2016, Defendants moved to vacate the judgment, "arguing primarily that judgments by confession are disfavored in Maryland, and [that] the circuit court lacked personal jurisdiction over them." *Id.* The circuit court denied Defendants' motion on November 10, 2016, *see id.*, and the Maryland Court of Special Appeals affirmed in an unpublished opinion on February 14, 2018, *see id.* at *5.

### C. Procedural History

In parallel with the Maryland state action, Presidential Bank began the instant action in D.C. Superior Court on July 18, 2016. *See* Compl. Alleging that Defendants had "absconded with th[e] funds" they were supposed to deposit in Presidential Bank accounts pursuant to the lockbox agreement, *id.* ¶ 22, Presidential Bank brought claims for conversion and for the appointment of a receiver, *id.* ¶¶ 37–65. Defendants removed the case to this Court, *see* Defs.' Notice of Removal, ECF No. 1, and filed an answer and counterclaim on February 3, 2017, *see* Countercl. Defendants asserted twelve affirmative defenses and brought nine claims in their counterclaim, including that Presidential Bank had retaliated against them for contacting the OCC by initiating foreclosure, in violation of the ECOA; had breached the forbearance agreement; and had tortiously interfered with Defendants' contractual rights by terminating third-party contracts Defendants had been engaged in with multiple vendors. *See generally id.*

5

On September 22, 2017, this Court dismissed all claims in the counterclaim with the exception of the ECOA retaliation, breach of contract, and tortious interference claims. *See Presidential Bank I*, 271 F. Supp. 3d at 164. On July 9, 2018, it granted Presidential Bank summary judgment on eleven of the twelve affirmative defenses on res judicata grounds, based on the preclusive effect of the Maryland confessed judgment. *See Presidential Bank II*, 318 F. Supp. 3d at 66–67. After the parties engaged in discovery, Presidential Bank moved for summary judgment on Defendants' remaining counterclaims on December 13, 2018. *See* Pl.'s Mem. Supp. Defendants filed their opposition on January 11, 2019, *see* Defs.' Opp'n, and Presidential Bank filed its reply on January 18, 2019, *see* Pl.'s Reply Supp. Summ. J., ECF No. 69. On August 13, 2019, Presidential Bank filed a supplemental memorandum in support of its motion. *See* Pl.'s Supp. Mem., ECF No. 71. Defendants filed their response on August 27, 2019. *See* Defs.' Resp. Supp. Mem., ECF No. 72. The motion is now ripe for consideration.

### III.  LEGAL STANDARD

Under Federal Rule of Procedure 56, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324.

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). In addition, "a motion for summary judgment may not be granted as conceded." *United States v. Mohammad*, 249 F. Supp. 3d 450, 456 (D.D.C. 2017) (citing *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016)); *United States v. Alrasheedi*, 953 F. Supp. 2d 112, 113 (D.D.C. 2013)). Instead, the court "may assume uncontested facts as admitted and then 'enter summary judgment . . . if, after fully considering the merits of the motion, it finds that it is warranted." *Id.* at 456–57 (quoting *Winston & Strawn*, 843 F.3d at 507–08).

## IV. ANALYSIS

Presidential Bank moves for summary judgment on Defendants' remaining three counterclaims. The bank contends that Defendants' retaliation and breach of contract claims are barred by res judicata, as well as that each claim fails on the law. *See* Pl.'s Mem. Supp. 8–17. In their opposition, Defendants do not address the breach of contract claim, and raise a single argument as to the two other claims, that the loans may not actually have been in default at the time Presidential Bank exercised its rights under the forbearance agreement. *See* Defs.' Opp'n 6–10. The Court addresses each claim in turn. Because it finds Defendants' argument meritless, and because Presidential Bank has otherwise shown that it is entitled to summary judgment, the Court grants the motion as to all three claims.

### A. Presidential Bank Did Not Retaliate Against Defendants Under the ECOA

Presidential Bank moves for summary judgment on Defendants' ECOA retaliation claim on two grounds. First, Presidential Bank argues that the claim fails as a matter of law because the bank started its preparations to foreclose on the collateral properties before becoming aware of the OCC complaint, and because the bank had a legitimate, non-retaliatory reason for doing so—Defendants' default. *See* Pl.'s Mem. Supp. 8–11. Second, Presidential Bank contends that the claim is barred by res judicata because it could have been raised in the Maryland state court litigation. *See id.* at 11–14. Because the Court agrees as to the first argument, it does not address the preclusive effect of the Maryland confessed judgment on Defendants' retaliation claim. Finding that Presidential Bank has provided a legitimate, non-retaliatory reason for its actions that Defendants do not meaningfully challenge, the Court grants the motion for summary judgment as to the ECOA retaliation claim.

As both parties point out in their briefs, courts have typically addressed ECOA discrimination claims under the framework used in Title VII cases. *See, e.g.*, *Williams v. Vilsack*, 620 F. Supp. 2d 40, 47 (D.D.C. 2009); *Haynie v. Veneman*, 272 F. Supp. 2d 10, 16 (D.D.C. 2003); *see also Garcia v. Johanns*, 444 F.3d 625, 631–32, 632 n.7 (D.C. Cir. 2006) (analogizing to Title VII precedent when reviewing ECOA claim and noting that "[o]ther courts have used Title VII precedent in cases involving ECOA"). Under the familiar *McDonnell Douglas* burden-shifting framework used to evaluate Title VII discrimination claims, the plaintiff bears the initial burden of establishing his prima facie case. *See Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). The burden then "shifts to the defendant to articulate some legitimate, non[retaliatory] reason for the [action in question]." *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). And if the defendant is able to articulate such a

reason, the burden shifts back to the plaintiff to show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Id.* (quoting *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253).

In order to establish a prima facie case of retaliation under the standard set in Title VII cases, a claimant "must show '(1) [it] engaged in statutorily protected activity; (2) [the lender] took an adverse . . . action against [it]; and (3) a causal connection exists between the two.'" *Norris v. Wash. Metro. Area Transit Auth.*, 342 F. Supp. 3d 97, 119 (D.D.C. 2018) (quoting *Carney v. American Univ.*, 151 F.3d 1090, 1095) (D.C. Cir. 1998)). Once the defendant has articulated a legitimate, non-retaliatory reason for the adverse action at issue, however, "the D.C. Circuit has emphasized that the inquiry into the *prima facie* case becomes 'an unnecessary and improper sideshow.'" *Id.* at 109 (quoting *Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)). Instead, courts "must resolve one central question: Has the [borrower] produced sufficient evidence for a reasonable jury to find that the [lender]'s asserted non-[retaliatory] reason was not the actual reason and that the [lender] intentionally [retali]ated against the [borrower] . . . ?" *Id.* (quoting *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).

Here, Presidential Bank argues that Defendants have not met their *prima facie* case because the Bank made the decision to exercise its remedies under the forbearance agreement before it became aware of the OCC complaint, as illustrated by the fact that the bank retained a law firm in connection with its relationship to Defendants on May 4, 2016. *See* Pl.'s Mem. Supp. 8–9. Presidential Bank also argues that it is uncontested Defendants were in default at the time the bank exercised its remedies under the forbearance agreement, which is a legitimate, nonretaliatory reason that defeats Defendants' claim. *See id.* at 9–11. Defendants retort that

Presidential Bank's hiring of a law firm could be consistent with the asserted default being a pretext for retaliation, and that it is possible Defendants were not actually in default in May 2016. *See* Defs.' Opp'n 6–9. The Court is unconvinced.

First, the Court finds that Presidential Bank has met its burden of articulating a legitimate, nonretaliatory reason for the exercise of its remedies under the forbearance agreement: Defendants were in default under the agreement, which allowed the bank to foreclose and collect on the debt. As Presidential Bank points out, Green repeatedly admitted during his deposition that the loans at issue were all in default at the time the Bank began exercising its remedies in May 2016. *See, e.g.*, Green Dep. 89:9–90:1 (noting that Defendants never brought the loans current after December 2015); *id.* at 166:7–9 (noting that the loans had been in default for around two years as of May 2016). Defendants contend that it is *possible* they were not truly in default at the time, based on a single e-mail from 2012 where an employee of Presidential Bank noted that the bank had established reserve accounts where it deposited $100 monthly from the rent of each apartment in Defendants' collateral properties. *See* Defs.' Opp'n 3–4, 8–9; May 1, 2012 Hughlett E-mail, Defs.' Opp'n Ex. 6, ECF No. 68-6.

According to Defendants, it is possible that Presidential Bank kept accumulating $100 per month, per apartment in reserve accounts between 2012 and 2016, and that at the time of the alleged default in May 2016 those accounts contained enough money to pay off any arrears in the loans. *See id.* at 8–9. But Defendants do not provide any evidence to support the argument that the reserve accounts had a sufficient balance to pay off the loans as of 2016. And not only is their speculation contradicted by Green's deposition testimony that the loans had been in default for around two years as of May 2016, but it is also contradicted by the text of both the loan modification and the forbearance agreement, in which Defendants admitted that the loans were

already in default as of, respectively, 2014 and 2015. As Presidential Bank points out, "unsubstantiated speculation does not create a genuine issue of material fact." Pl.'s Reply 4 (citing *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 61 (D.D.C. 2015)). Defendants had ample time during discovery to pursue this claim but failed to uncover any evidence supporting this theory. With Defendants providing no actual evidence to challenge the fact that their loans were in default as of May 2016, the Court finds that the bank has articulated a legitimate, nonretaliatory reason for its decision to foreclose and collect on Defendants' debt.

Next, the Court also finds that Defendants do not sufficiently challenge Presidential Bank's asserted legitimate, non-retaliatory reason to survive summary judgment. With Presidential Bank articulating a legitimate, nonretaliatory reason for exercising its rights under the forbearance agreement, the Court must resolve the central question of whether Defendants "produced sufficient evidence for a reasonable jury to find that [Presidential Bank's] asserted non-[retali]atory reason was not the actual reason and that the [Bank] intentionally [retaliated] against [Defendants]." *Norris*, 342 F. Supp. 3d at 39 (quoting *Brady*, 520 F.3d at 494). Defendants summarily contend that the default was a pretext for Presidential Bank to retaliate against them, *see* Defs.' Opp'n 8, but they do not provide *any* evidence of pretext to support that argument.

Neither does the temporal proximity between the filing of the OCC complaint and Presidential Bank's decision to exercise its remedies under the forbearance agreement, which appears to be Defendants' only evidence to support retaliatory intent, create an inference of retaliation sufficient to defeat summary judgment. In examining a Title VII retaliatory transfer claim in *Clark County School District v. Breeden*, the Supreme Court explained that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII

suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatsoever of causality." 532 U.S. 268, 272 (2001). Presidential Bank was in exactly such a situation here, having undertaken progressively more stringent measures to protect its rights pursuant to the lending agreements that ultimately led to the hiring of counsel. The Bank engaged into a loan modification agreement with Defendants when they defaulted in 2014, which Defendants failed to comply with. It then agreed to a forbearance agreement, which Defendants defaulted under as well. With the loans in default for two years and each successive measure to salvage the lending relationship failing, foreclosure was the next logical step—particularly after Green directed tenants to stop depositing rental payments in the accounts identified in the forbearance agreement. This chronology, which establishes that Presidential Bank was "proceeding along lines previously contemplated," *Breeden*, 532 U.S. at 272, neutralizes any temporal proximity inference of retaliation. With Presidential Bank's asserted non-retaliatory reason unchallenged, the Court therefore concludes that the bank has met its burden under the *McDonnell Douglas* framework and it grants the motion for summary judgment as to the ECOA retaliation claim.

### B. Defendants' Breach of Contract Claim Is Barred Under Res Judicata

Next, the Court reviews Presidential Bank's arguments as to Defendants' breach of contract claim. Although Defendants altogether fail to address that claim in their opposition, the Court does not grant the motion as conceded and it instead "fully consider[s] the merits of the motion" to determine whether summary judgment is warranted. *Mohammad*, 249 F. Supp. 3d at 456–57 (quoting *Winston & Strawn*, 843 F.3d at 507–08). Presidential Bank argues that summary judgment in its favor is warranted because the claim is barred by res judicata,

Defendants having failed to raise it in the Maryland state litigation. *See* Pl.'s Mem. Supp. 14–16. The Court agrees.

The Court extensively discussed the applicability of res judicata in this case in one of its prior opinions. *See Presidential Bank II*, 318 F. Supp. 3d at 70–75. Res judicata is "an affirmative defense barring the same parties from litigating a second lawsuit on the same claim, or any other claim arising from the same transaction or series of transactions and that could have been—but was not—raised in the first suit." *Id.* at 70 (quoting *Lizzi v. Wash. Metro. Area Transit Auth.*, 862 A.2d 1017, 1022 (Md. 2004)). "A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered," *id.* at 70 n.1 (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, (1984)), and, accordingly, "federal courts must accept the res judicata rules 'chosen by the State from which the judgment is taken,'" *id.* (quoting *Marrese v. Am. Acad. Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985)). As the Court noted in its prior opinion, under Maryland law:

> [T]he elements of res judicata, or claim preclusion, are: (1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and, (3) that there has been a final judgment on the merits.
>
> *Id.* at 70–71 (quoting *Anne Arundel Cty. Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037

(Md. 2005).

Here, "the parties are clearly the same" in this lawsuit as in the Maryland suit, *id.* at 71, because the same plaintiff and defendants are involved in both suits. And, "under Maryland law, 'a judgment by confession is entitled to the same faith and credit, as any other judgment' for res judicata purposes." *Id.* (quoting *Schlossberg v. Citizens Bank*, 672 A.2d 625, 627 (Md. 1996)). The only issue is therefore whether Defendants' breach of contract counterclaim "is identical to

13

the one determined in the prior adjudication." *Norville*, 887 A.2d at 1037. To make such a determination, "Maryland courts have traditionally applied the so-called 'same evidence' test," *Snell v. Mayor of Havre de Grace*, 837 F.2d 173 (4th Cir. 1988) (citing *MPC, Inc. v. Kenny* 367 A.2d 486, 489 (Md. 1977)), under which "the second suit is barred if the evidence necessary to support a verdict for the plaintiff in it would have been sufficient to sustain a judgment for him in the first suit," *id.* (citing *Klein v. Whitehead*, 389 A.2d 374, 384 (Md. Ct. Spec. App. 1978)).

With respect to the applicability of res judicata to counterclaims, Maryland courts have explained that "if the original defendant's permissive counterclaim would 'nullify' the prior judgment or impair the rights the prior judgment create, then claim preclusion bars the subsequent raising of the counterclaim." *Presidential Bank II*, 318 F. Supp. 3d at 75; *see, e.g.*, *Mostofi v. Midland Funding, LLC*, 117 A.3d 639, 644–45 (Md. Ct. Spec. App. 2015) ("When a party is sued, and that party could bring a permissive counterclaim, he or she is not required to 'raise or waive' that counterclaim unless successful prosecution of it would nullify the other party's claim."); *Rowland v. Harrison*, 577 A.2d 51, 55 (relying on the Restatement (Second) of Judgments § 22, which provides for application of res judicata when "successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action").

With these principles in mind, the Court has no trouble concluding that Defendants' breach of contract counterclaim is barred by res judicata. The counterclaim alleges that Presidential Bank obtained sufficient funds from the collateral properties' rents collected under the lockbox agreement to pay for the loans, but chose not to, presumably breaching the lockbox agreement. *See* Countercl. ¶¶ 62–63. According to Defendants, this failure to pay the loans with lockbox account funds means that Presidential Bank breached the forbearance agreement when it

14

placed them in default, because Defendants "could have met the forbearance loan conditions if Presidential Bank did not control their funds and prevent [them] from meeting the forbearance loan conditions." *Id.* ¶ 65. Such a claim clearly could have been raised as a defense to the original confessed judgment action, because it relates directly to who bears responsibility for the breach of contract the action was based on. And Defendants' success on that claim in this case would necessarily impair rights established in the Maryland state suit, because it would mean that the default the confessed judgment was obtained on in that suit was improper. Accordingly, the Court grants Presidential Bank's motion for summary judgment as to the breach of contract claim.

### C. Presidential Bank Did Not Tortiously Interfere With Defendants' Contractual Rights

Finally, the Court reviews the parties' arguments as to Defendants' tortious interference with contractual rights counterclaim. In their counterclaim, Defendants allege that Presidential Bank intentionally interfered with a property management contract they had with East Coast Development ("ECD") by "ordering [Defendants] not to fulfill its property management contract with [ECD]," *id.* ¶ 106, as well as interfered with other contracts with third parties by refusing to pay for those contracts, *id.* ¶ 103. Presidential Bank argues that all it did was to exercise control over the funds placed in accounts at the bank under the terms of the lockbox agreement, and that it was not required to pay for any of Defendants' third-party agreements under the terms of the lockbox agreement because Defendants were in default. Pl.'s Mem. Supp. 16–17. The Court agrees, and it accordingly grants Presidential Bank summary judgment as to the tortious interference claim.[1]

---

[1] As with the ECOA retaliation claim, Defendants make the argument in their opposition that Presidential Bank's conduct may have been unlawful because it is possible Defendants were not in default at the time the bank began exercising its remedies under the forbearance

Under D.C. law, "[t]o make out a prima facie case of intentional interference with contractual or business relations, [the plaintiff] must prove: '(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.'" *Armstrong v. Thompson*, 80 A.3d 177, 190 (D.C. 2013) (quoting *Onyeoziri v. Spivok,* 44 A.3d 279, 286 (D.C. 2012)). "[A] defendant may avoid liability if [it] can demonstrate that [its] conduct was 'legally justified or privileged,'" *id.* (quoting *Onyeoziri*, 44 A.3d at 286), but "the burden is on the defendant to prove that [its] interference was not wrongful, not on the plaintiff to prove that it was," *id.* (citing *NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 901 (D.C. 2008)). In other words, "when the defendant can establish that [its] conduct was 'legally justified or privileged,' no cause of action exists." *Id.* (quoting *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 326 (D.C. 2008)).

Here, the Court finds that Presidential Bank has conclusively shown that any interference it created with Defendants' third-party contracts by failing to pay for those contracts was legally justified. Presidential Bank argues that, under the lockbox agreement, it did not have to use the rents deposited in accounts associated with each collateral property to pay for any of the expenses related to the properties if the loans were in default. Pl.'s Mem. Supp. 16; *see also* Forbearance Agreement 6. Instead, in the event of default, the forbearance agreement authorized Presidential Bank to apply such rents in its discretion towards the balance of the loans "as necessary to preserve, protect and defend [its] interest in the Collateral Properties." Forbearance Agreement 6. As a result, Presidential Bank contends, because Defendants never brought the

---

agreement. *See* Defs.' Opp'n 9–10. For the reasons described above in Part IV.A., the Court rejects that argument.

16

loans current, it never had any obligation to pay expenses associated with the properties, and it acted lawfully to the extent it failed to do so.

The Court agrees. As discussed above, a tortious interference claim fails when the defendant can establish that the challenged conduct was justified by law. *See Armstrong*, 80 A.3d at 190. Here, it is undisputed that Defendants' loans were continuously in default from 2015 onwards. *See* Green Dep. 89:9–90:1. The forbearance agreement thus allowed Presidential Bank to apply the rental payments deposited by Defendants to the balance of the loans, or as otherwise necessary to protect its interest in the properties. *See* Forbearance Agreement 6. And in response to an order from this Court, Presidential Bank provided evidence indicating that it did just that, supplying the Court with account statements for each of the lockbox agreement accounts as well as a supplemental affidavit attesting that amounts were withdrawn from those accounts by the Bank only as it was legally entitled to under the agreement. *See* Account Statements, Pl.'s Suppl. Mem. Exs. 12–17, ECF Nos. 71-12 to 1-17; Suppl. Giraldi Aff. ¶ 8, Pl.'s Suppl. Mem. Ex. 10, ECF No. 71-10 ("[T]he only amounts Presidential Bank ever disbursed to third parties were for the payment of loans, taxes, insurance or utilities.").

To say the least, Defendants' response to Presidential Bank's supplemental memorandum is not a model of clarity. *See generally* Defs.' Resp. Pl.'s Suppl. Mem. As far as the Court can gather, Defendants appear to be arguing that Presidential Bank cannot demonstrate that it acted legally because, even with the additional evidence the Bank presented, there remains a "litany of factual disputes." *Id.* at 13. The Court cannot agree. Defendants represent that Presidential Bank "has not by way of any sworn affidavit, account statement, or deposition testimony competently demonstrated compliance with . . . the subject Forbearance Agreement." *Id.* at 6. But that is in fact what Presidential Bank has done, providing a supplemental affidavit and

17

account statements to support its argument that it complied with the forbearance agreement. *See generally* Account Statements, Suppl. Giraldi Aff. Defendants also point to a number of expenses for "legal charge[s]" in the lockbox accounts that they argue indicate that Presidential Bank failed to comply with the forbearance agreement, *see id.* at 8, but all those expenses occurred *after* the Bank decided to exercise its rights under the agreement in June 2016, and they are therefore not improper. Defendants had a full opportunity to take discovery, yet provide no evidence that *any* charge, legal or otherwise, is improper. Defendants' unadorned speculation cannot defeat summary judgment.

Defendants repeatedly suggest that something else might be amiss in the Bank's accounting—be it that the Bank may have maintained money in reserve accounts, *id.* at 7, failed to place insurance proceeds it received into one of the accounts, *id.*, or somehow failed to comply with the forbearance agreement because it included loan histories dating back to before the agreement was executed as exhibits to its supplemental memorandum, *id.* at 3.[2] But these allegations of impropriety do not warrant denying summary judgment here, when Defendants do not provide any evidence to support them. Accordingly, because Presidential Bank's decision not to make any third-party payments provided under the forbearance agreement was legally justified under the agreement's terms, and the Bank otherwise complied with the agreement, the

---

[2] Defendants appear to be confusing the loan transaction histories provided by Presidential Bank with the account statements the Bank provided for each of the lockbox accounts. Exhibits 2 through 9 in Presidential Bank's supplemental brief provide "transaction histories for each of the loans made to the Defendants that are the subject of the 2015 Forbearance Agreement." Suppl. Giraldi Aff. ¶ 2. And Exhibit 11 provides the "[e]scrow balance histories" for the collateralized properties. *Id.* ¶ 5. Given that the loans were made long before August 2015, it is not surprising that those histories might go beyond that date as well. By contrast, Presidential Bank only provides account statements for the lockbox accounts dating back to January 2016 in Exhibits 12 to 17. *Id.* ¶ 8.

tortious interference claim fails.  The Court grants Presidential Bank's motion for summary judgment as to the interference with contract claim.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 66) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 30, 2019
RUDOLPH CONTRERAS
United States District Judge